**UNITED STATES of America, Appellee,**

v.

**Louis SANZO, Appellant.**

**No. 469, Docket 81-1330.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1981.

Decided March 10, 1982.

J. Jeffrey Weisenfeld, New York City, for appellant.

James D. Harmon, Jr., Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Thomas P. Puccio, U. S. Dept. of Justice, Brooklyn, N. Y., of counsel), for appellee.

Before FRIENDLY, OAKES and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from a conviction for tax evasion in calendar years 1974 and 1977, 26 U.S.C. § 7201 (Counts 7 and 9), and for conspiracy with Ralph Trainello, Aberdeen Associates, Inc. (Aberdeen), and RNT Associates, Inc. (RNT), to defraud the United States by obstructing the Treasury Department in the collection of income taxes due and owing on funds due and disbursed by Trainello through Aberdeen and RNT (Count 4). After a jury trial before Mark A. Costantino, Judge, in the United States District Court for the Eastern District of New York, appellant Louis Sanzo was convicted on the above-stated counts, but acquitted on counts of conducting the affairs of Local 29 of the Blasters, Drillrunners and Miners Union through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) (RICO) (Count 1); conspiring to conduct the affairs of Local 29 through racketeering (Count 2); obstructing justice (Count 5); and evading income taxes for the year 1975 (Count 8). On appeal Sanzo argues (1) that the Government used false testimony and thereby denied him due process of law; (2) that the evidence of guilt on the conspiracy count was insufficient to prove his guilt beyond a reasonable doubt; (3) that the district court's failure to dismiss the RICO counts prejudiced him in respect to the three counts on which he was convicted; and (4) that he was prejudiced by the admission into evidence of testimony relating to organized crime.

## FACTS

The Government sought to show at trial that appellant Sanzo had accepted payments made through Aberdeen and RNT by their president, Ralph N. Trainello, in violation of the Taft-Hartley Act and had conducted the affairs of the union through a pattern of racketeering. The Government also sought to show that Sanzo had accepted a $500 bribe to let nonunion men on a job site, and had embezzled $291. The gist of the Government's case was that between 1974 and 1977 Aberdeen and RNT, both in the business of street excavation, disbursed over $400,000 to the several indicted defendants, at least $80,000 of which Sanzo received when he was an officer of Local 29. Later, according to the indictment, codefendant Ralph Trainello, an attorney and an owner of Aberdeen and RNT, demanded that unless Sanzo paid him the sum of $115,000 he would report the Aberdeen-RNT payoffs to the authorities. Sanzo acceded to the demand by making payment

through a company in which he owned a hidden interest.

Aberdeen employed members of the Blasters Union for its profitable street excavation work, principally for various public utilities. From 1968 to 1971 Aberdeen was owned by Joseph Cipollone and ten others, eight of whom offered to buy out Cipollone, his brother, and Joseph Capogrosso. Sanzo suggested that the Cipollones and Capogrosso instead buy out the eight partners. He introduced them to Trainello, who handled the buy-out matter as their attorney. After the buy-out Trainello curiously was made president of Aberdeen and given ownership of 50% of its outstanding stock, though he invested no capital himself. The two Cipollone brothers and Capogrosso became the other nominal owners of Aberdeen.

The Government's evidence was that from 1974 through 1977 Sanzo and Joseph Matranga, then Local 29's president, requested various persons to cash checks totaling at least $80,000, drawn on the account of Aberdeen or its successor, RNT, and signed by Trainello. The surrogate check cashers for the most part "laundered" the checks through their own bank accounts and returned the cash proceeds to Sanzo or Matranga, but Sanzo did not report the proceeds as income. All payments were hidden by false entries made in the books of Aberdeen and RNT, which deducted the payments as expense items. In 1974 Albert Moschella, a contractor, and his wife, laundered three Aberdeen checks totaling more than $34,000 for Sanzo. Mario Montuoro, then secretary-treasurer of Local 29, laundered a $10,000 check in the same year. Joseph Bastone, a restaurant keeper and Montuoro's landlord, cashed a $1,000 Aberdeen check payable to cash in 1975 and returned the proceeds to Sanzo. In May 1976 Anna Stamulis, a former claims adjuster for Local 29, laundered a $5,000 Aberdeen check payable to cash and signed by Trainello. In May 1977 at Trainello's request Rose DiBiase, his former secretary, cashed an Aberdeen check payable to cash in the amount of $5,000 and returned the cash to Trainello, who gave it to Sanzo in exchange for a receipt. DiBiase also cashed Aberdeen checks payable to cash at Trainello's request and returned the money to him on other occasions.

In late 1977, as a result of a falling-out between Trainello and the Cipollones, Trainello formed RNT and the Cipollones formed Cipoco Construction, Inc., Jo-Lo Leasing Corp., and Berth-Ange Realty Corp. Jo-Lo entered the business of leasing construction equipment purchased in part through money provided by Sanzo. Berth-Ange purchased the building in which Cipoco was located, in part through money provided by Sanzo. RNT and Cipoco both continued in the business of street excavation. In September 1977 Sanzo gave John Pelosi, an attorney representing him in several matters, an RNT check in the amount of $4,000 payable to Ralph Trainello and endorsed by Trainello. Part of the proceeds were used to cover Sanzo's legal fees, and Pelosi returned the balance in cash to Sanzo. Joseph Cipollone testified that in October 1977 at a sandlot baseball game Sanzo asked him to cash an RNT check in the amount of $5,000 signed by Trainello. Cipollone's wife deposited the check in their personal savings account; Cipollone then gave Sanzo $5,000 in cash withdrawn from a Cipoco bank account. In December 1977 Joseph Cipollone's brother John cashed another $5,000 RNT check signed by Trainello for Sanzo, and gave Sanzo the cash. Income of $14,000 derived from the Aberdeen checks cashed by Pelosi and the Cipollone brothers was not reported on Sanzo's 1977 tax return.

The evidence said to relate to organized crime was as follows. Sometime in January or February 1978, according to Joseph Cipollone, Sanzo asked him to attend a meeting with Samuel "Big Sam" Cavalieri, whom Sanzo considered to be his "boss" and whose son was the administrator of Local 29's pension fund. Sanzo told Cipollone that the meeting was called about Aberdeen-RNT checks which Trainello claimed to have cashed for Sanzo after Sanzo had used Cavalieri's name to threaten Trainello. On the way to the meeting at Cavalieri's

"social club", Sanzo asked Cipollone to tell Cavalieri that the cash generated by the Aberdeen-RNT checks had been returned to Trainello, although Sanzo had in fact kept the money for himself. At the meeting Trainello produced a number of Aberdeen checks and told Cavalieri in Sanzo's presence that the checks had been used to pay $200,000 to Sanzo. Sanzo denied this. At the end of the meeting Trainello was assured that Cavalieri's name would not be used to threaten anybody.

Shortly thereafter Sanzo asked Joseph Cipollone to place Cavalieri on the payroll of Cipoco as a night watchman. Routinely the paychecks were given to Sanzo by Frank Panico, Cipoco's controller, and cashed by Sanzo, who then returned the proceeds to Panico.

The evidence of obstruction of justice and blackmail was as follows. The falling-out between the Cipollones and Trainello resulted in the institution of a civil suit. In the course of the suit Trainello told Joseph Cipollone that he wanted to speak to Sanzo "because he wanted money." In later meetings with Sanzo, while Aberdeen and RNT were being audited, Trainello demanded that he be paid $115,000 "to pay the taxes." He warned Sanzo that he would "go to the FBI and ... would get everybody in trouble" if Sanzo failed to pay. Sanzo, a silent partner with Cipollone in Jo-Lo and Berth-Ange, requested to be bought out of those companies for $112,000 to generate money with which to pay off Trainello. Three Cipoco checks totaling $115,000 were deposited in Trainello-controlled bank accounts in order to buy Trainello's silence on Sanzo's behalf. Trainello, however, apparently used only $23,000 to pay back withholding taxes unrelated to Sanzo payments.

Subsequently an undercover agent, posing as a contractor who would be hiring members of Local 29, met with Sanzo at a diner and agreed to pay Sanzo $5,000 for permission to use fewer people on a fictitious job site than the union contract required. Payment of $500 front money was recorded on a tape played to the jury.

After severing the trial of Trainello and another codefendant, the Government compelled Trainello to testify as a Government witness with an order of immunity issued under 18 U.S.C. § 6001. Trainello testified that he paid Sanzo about $200,000 over the years by cashing Aberdeen and RNT checks. He was not questioned on direct examination about the threats allegedly made by Sanzo. On cross-examination, however, Sanzo's attorney adduced testimony from Trainello that the payments were made under duress created by threats from Sanzo. The prosecution attacked this extortion aspect of Trainello's testimony by having Trainello acknowledge on redirect that Sanzo signed a receipt for one payment, that Trainello never reported the alleged threats to the police, and that he declined to cooperate with agents of the United States Department of Labor by recording telephone conversations with Sanzo.

## DISCUSSION

### I. *Government Use of False Testimony*

█ Sanzo argues that the Government knowingly or negligently presented "perjured or false" testimony from Government witnesses Mario Montuoro, Anna Stamulis, and Joseph Cipollone, three of the surrogate check cashers.

First, Sanzo claims that Montuoro and Stamulis testified falsely concerning a fraudulent $600 benefit claim submitted to Local 29 for dental work. Appellant points to some incomplete evidence of the involvement of Montuoro, Stamulis, and Sanzo in the submission of a fraudulent dental claim, but we see no evidence of any false testimony by Montuoro regarding his involvement, and little, if any, credible evidence that Stamulis denied untruthfully that she had completed the dental form.

Defense counsel attempted to impeach Montuoro's testimony that he had been fired from his position as union secretary-treasurer. He questioned Montuoro concerning what appeared to be a prior inconsistent statement, which the Government had turned over to the defense, "I didn't

leave, I wasn't fired, I am on Workmen's Compensation." Montuoro's subsequent explanation that he had been "forced to resign" from his position as trustee, which to him was equivalent to being fired, was apparently intended to apply to his position as secretary-treasurer as well.[1] The defense also challenged Montuoro's testimony that he had told one Jerry Levine to install an air conditioner at union expense in the home of Sanzo's mother by introducing Levine's conflicting testimony.

Joseph Cipollone's testimony that he agreed at a sandlot baseball game to cash a $5,000 check for Sanzo was challenged on cross-examination. Defense counsel confronted Cipollone with testimony given by him in a deposition in a civil suit in which he denied ever having cashed a check for Sanzo. Again, the Government provided the defense with the deposition under the Jencks Act, 18 U.S.C. § 3500. Later the defense sought to impeach Cipollone through testimony that the baseball season was over by the time the RNT check was cashed. As far as we can see, this was a typical situation in which the Government supplied the defense with the ammunition to impeach its own witness.

There is nothing to show that the Government recklessly, let alone knowingly, used false testimony. At most the Government was negligent. The cases Sanzo cites do not support the proposition that the Government's negligent use of false testimony violates due process. *Imbler v. Craven*, 298 F.Supp. 795 (C.D.Cal.1969), *aff'd sub nom. Imbler v. California*, 424 F.2d 631 (9th Cir.), *cert. denied*, 400 U.S. 865, 91 S.Ct.

100, 27 L.Ed.2d 104 (1970), was a case in which there was not only "no doubt that false testimony was given," 298 F.Supp. at 803, and in which it was "readily apparent that the evidence . . . was material," *id.* at 804, but the prosecutor had such reason to believe that the testimony was false and he acted "reckless[ly]" in making use of it, *id.* at 807. Judge Weinfeld's dictum in *Welcome v. Vincent*, 418 F.Supp. 1088, 1093 (S.D.N.Y.1976), *rev'd on other grounds*, 549 F.2d 853 (2d Cir.), *cert. denied*, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977), that "the deliberate, knowing, or even negligent use of false testimony by the prosecution" may entitle a defendant to a new trial was issued in a case in which there was no prosecutorial misconduct of any kind. As Judge Weinfeld pointed out in that case, the Government often must draw on the testimony of persons of doubtful character. 418 F.Supp. at 1094. To impose a standard of negligence on the prosecution is not required by the cases or the policies underlying the rule against knowing use of false testimony, first announced by the Supreme Court in *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935) (conviction "contrived" in a "pretense of a trial . . . through a deliberate deception"). Moreover, Sanzo had a full opportunity to cross-examine and contradict the witnesses, which he used to good advantage, and indeed the information enabling him to do so was in certain cases given to him by the Government.

Beyond this, there is no showing that any of the allegedly perjurious testimony of prosecution witnesses could have affected

---

1. Montuoro's testimony regarding this issue is confusing, and Sanzo's counsel fully exploited this confusion at trial in an effort to impeach Montuoro's credibility. Montuoro initially testified that he had been "fired from [the] union" by Sanzo on May 12, 1978. Sanzo's counsel then sought to impeach him by reference to a letter of July 19, 1978 to the Board of Trustees of Local 29, in which Montuoro wrote, "I did not resign and as far as I know, I was not fired," as well as by reference to the above-quoted tape-recorded statement made in the course of a conversation with Sanzo. Montuoro's explanation at trial, that he had been forced out of his union positions, restated the

following testimony given earlier at an NLRB hearing:

Question: Now, Mr. Montuoro, you did say there was no doubt in your mind that you knew on May 12th that you were fired from that job?

. Answer: Oh, yes, I knew they didn't want me there, that's for sure.

It is not readily apparent from the foregoing whether, and to what extent, Montuoro's claim to have been fired was perjurious. Therefore, the question of Montuoro's credibility in this case was properly for the jury, rather than the prosecution, to resolve.

the judgment of the jury. *See United States v. Provenzano*, 615 F.2d 37, 47 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). Stamulis's testimony concerned 1976 income, as to which Sanzo was acquitted. While part of Montuoro's testimony regarded 1974 income, his alleged falsehoods related only to collateral matters. Sanzo's counsel took advantage of the opportunity to challenge the credibility of Montuoro, as well as that of Joseph Cipollone, based upon any misstatements.

## II. *Sufficiency of the Evidence*

■■■ Sanzo next argues that there was insufficient evidence to demonstrate a conspiracy of income tax evasion because no direct evidence showed that Trainello knew Sanzo would not report the receipts of the cash or that Sanzo knew Trainello would claim tax deductions. Existence of and participation in a conspiracy with the requisite criminal intent may be established, however, through circumstantial evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). There was sufficient circumstantial evidence from which the jury could find in this case that Trainello knew that Sanzo was unlikely to report as income large sums of laundered money, and that Sanzo equally knew that Trainello would have to assign on his books some legitimate purpose for the payments that could form the basis for a tax deduction. Through Sanzo's efforts in 1972 Trainello became the 50% owner of a highly profitable construction company without any apparent capital investment. The Government's evidence was that Sanzo derived $75,000 to $200,000 in income from cash through Aberdeen-RNT checks. Many of the checks were made payable to cash though carried on the corporate books as miscellaneous field expenses, officers' salaries, machinery and equipment, or as a loan and exchange, so as to conceal that Sanzo was the true recipient. The proceeds of many of the checks were laundered through bank accounts of surrogate check cashers. There was evidence that after a civil audit of Aberdeen resulted in the disallowance of deductions taken for the miscellaneous field expense account, to which many of the pay-

offs to Sanzo had been charged, Sanzo paid Trainello $115,000 as "hush money" so that he would not report the payoffs to law enforcement authorities. The false Aberdeen book entries assisted Sanzo in failing to disclose income on his own returns, while Sanzo's omission of Aberdeen-RNT income on his returns enabled Aberdeen to claim expense deductions to which it was not entitled, *i.e.*, for payoffs in violation of the Taft-Hartley Act. The result was substantial tax evasion by Sanzo and Aberdeen. The inference could properly be drawn from this evidence taken as a whole that Sanzo conspired with Trainello and others to impede the Internal Revenue Service in its collection of income taxes.

## III. *Failure to Dismiss Racketeering Counts*

■■■ Sanzo next argues that he was prejudiced by the jury's consideration of the RICO charges, of which he was ultimately acquitted. The argument is that references to racketeering were in and of themselves prejudicial. However, the court made it very plain to the jury that "you must as a matter of law consider each count of the indictment and the individual defendant's involvement in that count separately." The jury's acquittal of Sanzo on the racketeering charges indicates that it was in fact selective. *See United States v. Ferrara*, 451 F.2d 91, 97 (2d Cir. 1971), *cert. denied*, 405 U.S. 1032, 92 S.Ct. 1291, 31 L.Ed.2d 489 (1972). Moreover, the jury could well have found as to the RICO counts that although payments were made to Sanzo, they were not made to him in his capacity as a union official or by virtue of that capacity. *See United States v. Scotto*, 641 F.2d 47, 54 (2d Cir. 1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). Certainly no prejudice could have resulted from such a finding.

## IV. *Evidence of Testimony Related to Organized Crime*

■■■ Finally, Sanzo argues that Joseph Cipollone's testimony concerning the meeting with Sam Cavalieri, during which Trai-

nello confronted Sanzo over the Aberdeen-RNT payments, created "intimations of" and "a cloud of" organized crime, resulting in undue prejudice. But Cipollone's testimony that Sanzo asked him to tell Cavalieri that the cash from the Aberdeen-RNT checks had been returned to Trainello constituted an admission by Sanzo that he had received the Aberdeen-RNT payoffs and as such was highly probative. Nor was Sanzo prejudiced by testimony that the subject of the meeting was Trainello's claim to have been threatened by Sanzo, because it was Sanzo, not the Government, who introduced direct evidence of those threats. In any event, we think the trial judge properly exercised his broad discretion in finding that the considerable probative materiality of the evidence outweighed any prejudicial effect therefrom. *United States v. Robinson*, 560 F.2d 507, 514–15 (2d Cir. 1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

Judgment affirmed.