**UNITED STATES of America**

v.

**Matthew MADONNA, Defendant.**

**Nos. 76 Cr. 846 (RLC), 81 Civ. 7269 (RLC).**

United States District Court, S.D. New York.

April 12, 1982.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for plaintiff; James R. Devita, Asst. U.S. Atty., New York City, of counsel.

Newman & Adler, New York City, for defendant; Gustave H. Newman, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

### I

In a motion filed on November 20, 1981, pursuant to 28 U.S.C. § 2255 and fully submitted as of March 5, 1982, defendant Matthew Madonna moves to vacate and set aside his conviction and sentence.

Madonna was tried and convicted on a two count indictment charging a conspiracy to import heroin into the country and possession of heroin with the intent to distribute the drug. His trial, with two codefendants, began on November 1, 1976, and ended on November 16, 1976, when the jury found the defendant guilty on both counts. Madonna was subsequently sentenced to 15 years imprisonment on each count to run consecutively and a $30,000 fine. On April 4, 1977, his conviction on appeal was affirmed from the bench in an oral opinion and summary order. 556 F.2d 562 (2nd Cir.1977). The disposition of an appeal in summary fashion means that the Second Circuit considered the issues raised to be so insubstantial that no jurisprudential purpose would be served by a written opinion, and such determinations are not citable as precedents pursuant to § 0.23 of the Local Rules of the Second Circuit. Rehearing was denied on May 27, 1977, and the United States Supreme Court refused review on October 31, 1977. 434 U.S. 919, 98 S.Ct. 392, 54 L.Ed.2d 275 (1977).

On February 27, 1978, defendant filed a Rule 35, F.R.Crim.P., motion to set aside or modify the sentence on the ground that it was illegal and that the court had relied on inaccurate considerations not based on the record. That motion was denied by this court on March 22, 1978, and the claims were rejected by the Court of Appeals on September 29, 1978, this time in a written opinion. 582 F.2d 704 (2d Cir.1978). The Supreme Court denied certiorari on January 8, 1979. 439 U.S. 1069, 99 S.Ct. 838, 59 L.Ed.2d 34 (1979).

The gravamen of the instant motion is (1) that the government allowed a witness, Nicholas Visceglie, who testified on a collateral matter, to give false testimony; (2) that in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government suppressed or failed to reveal the substance of what transpired at a hearing involving Visceglie's relations with a codefendant and with the government in a case pending in the United States District Court for the District of New Jersey, thereby barring defendant from access to material which would have enabled defendant to subject Visceglie to more searching cross-examination than was possible at trial; and (3) that the government misled the court as to the importance of the transcript of the New Jersey hearing to the conduct of defendant's defense here. It is argued that since Visceglie's testimony was critical to the jury's finding of the requisite intent to convict the defendant, the conviction must now be set aside. In the alternative, a hearing on the issues raised is requested.

The motion is supported by affidavit of counsel and exhibits, including the transcript of the New Jersey hearing and various letters from New York and federal authorities disclosing the time Visceglie became an informer and the nature of his cooperation. The government opposes the motion and in support of its position has filed affidavits of the Assistant United States Attorney who represented the government at defendant's trial and of various prosecutorial personnel involved in the New Jersey hearing. Defendant's counsel has replied with a further affidavit. Both sides have filed memoranda of law.

While counsel has spent considerable time and effort on this matter and expansive discussion is required to dispose of the issues raised, the motion, in essence, is frivolous and is denied in all respects.

## II

In the spring of 1976, Joseph Boriello brought back from Thailand to Salvadore Larca in New York, a codefendant of Madonna, a sample of heroin which, when tested, was found to be pure. Larca authorized Joseph Boriello to return to Bangkok to buy a kilogram of heroin. Boriello returned to New York in June, 1976, with the kilogram of heroin, and it was sold here for $100,000. A second trip was then organized. Larca supplied Boriello with four false bottom suitcases and a budget of $100,000 for the purchase of 10 kilograms of heroin, travel expenses for himself and two couriers. Boriello secured Jan Portman and Eugene Travers for the latter task. In July, 1976, he returned to Bangkok to purchase the heroin. When the couriers arrived, the heroin was packed in the false bottom suitcases. Boriello left Bangkok on August 16, 1976; the two couriers, carrying the heroin and travelling separately, left for New York the next day. Both were arrested in Honolulu and immediately agreed to cooperate. Most of the heroin Travers carried was replaced with a substitute. On August 19, 1976, he flew to New York with two government agents, with the substituted substance, along with approximately 32 grams of heroin, packed in two of the suitcases.

The same day, Madonna, under the name of Paul de Robertis, rented a red Ford Granada from Hertz at New York's LaGuardia airport. He drove the car from the airport to a parking lot near his home where he left it. On August 20, 1976, Boriello contacted Travers at the latter's apartment in the Bronx. After telling Travers to wait for further instructions, Boriello went to Larca's home where he met with Larca and Madonna. Larca took Boriello to

the parking lot to pick up the red Ford Granada that Madonna had rented and parked there the day before. Larca told Boriello to pick up the heroin and deliver it in the Hertz car at 5:00 p.m. to 58th Street and Fifth Avenue, across from F.A.O. Schwarz.

Boriello went to Travers' apartment and took possession of the suitcases that he believed were filled with heroin. While he was loading the suitcases into the trunk of the car, he was arrested. He immediately agreed to cooperate. Boriello then proceeded to the Manhattan rendezvous under government surveillance. He was met by Madonna and Larca. Boriello gave Madonna the keys to the Hertz car. Larca gave Boriello the keys to Larca's car and told Boriello to go home to wait for a call. Madonna entered the car on the driver's side and Larca on the passenger side, at which point both were arrested. Madonna advised the arresting officers that he was Paul de Robertis but subsequently used his real name.

Madonna's defense was lack of knowledge and intent; he claimed that he was innocently accompanying Larca and knew nothing about the heroin. Because of that defense, the government was permitted to adduce through the testimony of Nicholas Visceglie, then under sentence on a state conviction, that he had been involved in 1972 with Madonna and Larca in a deal to buy 10 kilograms of heroin for $200,000, but he and his partner could not raise the cash and the deal was called off.

### III

Defendant contends that Visceglie lied about the nature and extent of his cooperation with law enforcement authorities, lied about the place of his arrest, the consideration he was to receive from the government for testifying, and his relationship with Paul Levy in the case pending in the United States District Court in New Jersey.

Defendant has established on the first point that Visceglie had begun cooperating with local police as early as 1973. At the trial Gerald Alch, Madonna's counsel, on cross examination asked Visceglie when he first became an informant. Visceglie responded in 1975. Prior to that question being put, Visceglie had been asked where in the Metropolitan Corrections Center, a federal facility here in New York, he was housed and if the third floor where he was staying was where informants were kept segregated from the general prison population. These questions leading up to those about his cooperation with law enforcement officials could certainly have led the witness to believe that the questions related to his cooperation with federal authorities. Later, Alch said "I believe you testified that you had begun to cooperate with the Federal Government in approximately July or August 1975." Transcript ("Tr.") 1125. This clearly shows that Madonna's counsel intended by his questions to explore Visceglie's cooperation on the federal side and understood Visceglie's responses to relate to cooperation with federal officials. Since both Madonna's counsel and Visceglie understood the questions and answers related to the latter's federal activities, the record cannot now be twisted to suggest that the inquiry was meant to embrace cooperation with state or local law enforcement authorities as well.

■ Moreover, since it is clear that Alch understood Visceglie's responses to relate solely to his cooperation with federal law enforcement authorities, it was incumbent on Alch, if he wished to explore an additional area, to ask Visceglie specifically when his cooperation with state or local authorities began. Since that question was never put, the assertion that Visceglie gave false testimony must be rejected. There was no deliberate deception by the presentation of known false evidence, and the rule that convictions so secured must be set aside, *see, e.g., Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972); *Mooney v. Holohan,* 294 U.S. 103, 113, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *see also United States v. Sanzo,* 673 F.2d 64 (2d Cir.1982), has no application to this case.

■ The other matters raised, even if the witness did lie, are irrelevant. However, Visceglie testified truthfully about his expectations of government assistance when he stated he did not believe that its help would result in his state sentence being reduced. The government did advise state authorities of Visceglie's cooperation, and it did not result in a modification of his sentence. Yet, even if the government's intervention had effected a shortening of the state sentence, it is difficult to discern in what respects that would make Visceglie's testimony false. He did not misrepresent what the government had promised it would do. He testified that he was told that his cooperation would be brought to the attention of the sentencing judge and relevant authorities. When he testified, Visceglie could not have been expected to know as a fact the reaction of state authorities. He was expressing only a belief or opinion, and he was certainly entitled to state what he thought might happen.

■ The additional claim that Visceglie testified falsely concerning where he was arrested and about his relationship to Levy and that such false testimony provides the basis for a motion to set aside the conviction is without merit. Even if Visceglie did lie about these matters, they were not material either to the merits of his testimony or to his credibility as a witness.

We now turn to the claims concerning prejudice to defendant in not having access to the transcript of the closed hearing before Judge Meanor, who presided over the proceedings in New Jersey. Visceglie and Donald Varna along with a third codefendant were under indictment for conspiracy in the United States District Court for the District of New Jersey. Visceglie and Varna were both represented by Herbert Siegel. Visceglie was acting as a government informer at the time, but he did not tell Varna or Siegel that he was cooperating with the government.

From August, 1975 until February 1, 1976, Visceglie cooperated with federal Drug Enforcement Administration ("DEA") authorities, but apparently the federal prosecutors handling the trial preparations in the case were not initially aware of Visceglie's role. On learning of Visceglie's cooperation for the first time, the Assistant United States Attorney handling the case advised the court of the problem in February, 1976. On Judge Meanor's instructions all defendants were notified that Visceglie had been an informer since August, 1975.

In April, 1976, Herbert Siegel advised Visceglie that he could no longer represent him and on May 20, 1976, moved to dismiss the indictment against Varna. Judge Meanor held an *in camera* evidentiary hearing on August 16, 1976, to determine whether Visceglie's role as secret informer and codefendant warranted dismissal of the indictment against Varna. On Judge Meanor's advice the government was represented by counsel who had no prior involvement in the case. The court instructed all witnesses and participants that the evidence at the hearing was not to be disclosed to anyone until after the conclusion of the case in a final judgment. After the hearing, the court ordered the transcript sealed but refused to dismiss the indictment against Varna.

The government decided not to proceed against Visceglie and the trial proceeded against Levy and Varna on December 25, 1976. After two days of trial Levy pleaded guilty to a superseding indictment and the trial continued against Varna alone. He was found guilty, but on June 21, 1978, his conviction was reversed and the indictment ordered dismissed. *See United States v. Levy*, 577 F.2d 200 (3d Cir. 1978).

When Visceglie testified here at the defendant's trial, his dual role as an informer and a codefendant with both Varna and himself being represented by the same counsel was elicited on cross-examination. It was brought out that he did not tell Varna or Siegel that he was an informer, and testimony was elicited concerning the course the matter took when Visceglie's cooperation with the government became known. In short, all facets of this matter were fully explored on cross-examination both by counsel for defendant and counsel for Larca. Tr. 1127, 1129, 1151–58.

Before Visceglie was called, Madonna's counsel advised the court that defendant's investigator had ascertained that the transcript of the hearing pertaining to testimony concerning Visceglie's dual role was under seal pursuant to Judge Meanor's order, and that the judge had refused to allow defendant to inspect the record of that proceeding. Tr. 758–66. The court agreed to speak to Judge Meanor to determine whether it would be appropriate to seek to secure the transcript of the hearing for defendants' use in examining Visceglie.[1] The court did explore the matter with Judge Meanor in a telephone conversation and was satisfied that the transcript of the hearing before Judge Meanor was not relevant to any issues in the trial in the instant case, and counsel were so advised. Counsel expressed concern that Visceglie might deny having been in both Varna's camp and the government's at the same time. They stated that without having the New Jersey transcript, they would then be helpless to explore the matter further. The court assured them that if that did occur, it would reconsider its decision not to request Judge Meanor's permission to obtain the transcript. Tr. 867–70. Visceglie was called and after his cross-examination no further request of the court to secure the transcript was made by defense counsel. The court can only conclude that no further request was made because defense counsel was satisfied that the matter had been thoroughly explored.

■ Defense counsel was fully conversant with what had occurred in the New Jersey case. The reason articulated at trial for counsel's need of the transcript was to be able to confront Visceglie in the event he lied on the witness stand about his dual role. Visceglie, however, freely admitted to what he had done and even assented to the unflattering characterizations defense counsel ascribed to his role. The inquiry into Visceglie's activities, therefore, was not blocked as counsel feared, but was fully explored. Since the court could not have

allowed counsel to turn defendant's trial into a mini-trial of a collateral issue, counsel could have done no more with physical possession of the transcript of the hearing than was actually accomplished without it. In any event, the outcome of the trial would not have been affected by counsel having the use of the transcript. Therefore, no *Brady v. Maryland, supra,* issue is involved; *see also United States v. Agurs,* 427 U.S. 97, 104–05, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976); *United States v. Provenzano,* 615 F.2d 37, 47 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980).

The New Jersey matter was, at best, collateral, and the transcript was of use to defendant only for impeachment purposes. It had no bearing on the merits of the charges against Madonna. But the transcript would have served no purpose even to impeach since Visceglie admitted to everything.

Moreover, there is no showing of any misconduct on the part of government counsel in this case. The Assistant United States Attorney who was government trial counsel in the case denies having a transcript of the hearing, and there is no evidence to the contrary. Nor is there evidence that he had any greater knowledge of what had transpired in the proceedings before Judge Meanor than defendant. Indeed, it seems clear enough from this record that defendant's counsel was more familiar with what had caused Judge Meanor to hold the closed hearing than was the Assistant United States Attorney.

■ Finally, and most importantly, Visceglie's testimony was not critical to defendant's conviction. There was more than sufficient evidence, other than Visceglie's, from which the jury could reasonably infer knowledge and intent beyond a reasonable doubt. Madonna had been under surveillance for a long time and was under surveillance when he had been observed renting the red Ford Granada under the assumed name of Paul de Robertis. He had

1. Counsel for Salvadore Larca as well as counsel for Madonna were requesting that the court secure the transcript for their use in the cross-examination of Visceglie.

been kept under surveillance when he drove the rented car from the airport to the parking lot. There was testimony that Larca was defendant's chief lieutenant, and Madonna was present at Larca's home when Boriello arrived to receive instructions about where to deliver the heroin which all believed Travers had brought from Bangkok to New York. Boriello was taken by Larca to the red Granada and instructed to load the drugs in the car and drive it to midtown Manhattan. Madonna and Larca were at the rendezvous waiting for Boriello. Madonna took the keys to the car from Boriello and when arrested identified himself as Paul de Robertis. That surely was sufficient evidence for the jury to conclude that Madonna was guilty as charged beyond a reasonable doubt. That the evidence was largely circumstantial does not diminish its probative value or intrinsic significance in leading to defendant's conviction. The government was not required to show Madonna physically handling the heroin to convince the jury of his knowledge and intent beyond a reasonable doubt. Visceglie's testimony was mere frosting which the government probably utilized in order to leave no available stone unturned to secure defendant's conviction.

Although in a letter to District Attorney Merola dated March 22, 1977, government counsel describes Visceglie's testimony as "critical in putting the lie to Madonna's well orchestrated defense and resulted in his conviction," undue significance cannot be given to that statement. The characterization of the testimony is from a government attorney who did not participate in the trial of the case. The letter was in fulfillment of the government's promise to make Visceglie's cooperation known to state authorities. Under the circumstances, proper perspective requires that its generous evaluation of Visceglie's testimony be somewhat downgraded. And most significantly, the court presided over the trial and is in a far better position to gauge the importance of Visceglie's testimony to the outcome of the case than counsel who did not attend the trial, hear the testimony and see the reaction of the jury as the trial developed. There is no doubt in the court's mind that without the prior similar act testimony, defendant would have been found guilty beyond a reasonable doubt.

The court agrees with the government that defendant's motion is actually one for a new trial based on newly discovered evidence. Under Rule 33, F.R.Cr.P., such a motion must be made within two years of final judgment. Defendant was sentenced on December 21, 1976. The appellate process on the merits was concluded on October 31, 1977, when certiorari was denied. However, defendant could not have had access to the transcript of the closed hearing until after the decision of the Third Circuit in *United States v. Levy, supra.* That decision was handed down initially on May 3, 1978, and was amended on June 21, 1978. Defendant admits access to the transcript "when the defendant Varna's conviction was reversed by the Third Circuit Court of Appeals" Def.Mem. at 7. That means it was in counsel's possession by June or July, 1978, at the latest. Accordingly, this motion could have and should have been filed at least by the summer of 1980.

■ By merely designating this a § 2255 motion, the time constraints applicable to a motion based on newly discovered evidence cannot be so readily circumvented. *Brach v. United States,* 542 F.2d 4, 8 (2d Cir.1976). The delay of over three years in making this motion after the material became available is much too long, and the motion could be denied on that ground alone. However, even if the motion were accepted as timely, the newly discovered evidence must be such that it would probably lead to acquittal. *See United States v. Gilbert,* 668 F.2d 94 (2d Cir.1981); *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir. 1980). It is clear from what has been said heretofore that the evidence defendant relies on to support this motion cannot satisfy such heavy burden of proof requirements. Accordingly, the motion to set aside the conviction is denied, and in view of the insubstantial nature of the case made for relief, the alternative of a hearing on the issues raised is also denied.

IT IS SO ORDERED.