**UNITED STATES of America, Appellee,**

v.

**Arthur MONTOUR, a/k/a Kakwirak-eron, Defendant–Appellant.**

**No. 1566, Docket 90–1463.**

United States Court of Appeals, Second Circuit.

Submitted June 10, 1991.

Decided Sept. 18, 1991.

Victor Aronow, Phoenix, Ariz., for defendant-appellant.

Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., John G. Duncan, Asst. U.S. Atty., Syracuse, N.Y., for appellee.

Before FEINBERG, NEWMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Arthur Montour, a/k/a Kakwirakeron, appeals from his conviction by a jury before Judge McCurn for conspiring to resist and impede and for resisting and impeding the execution of search warrants. His principal objection is to the sufficiency of the evidence, although he also argues that the trial court erred in failing to strike several overt acts from the indictment and denied his Sixth Amendment right to present witnesses on his behalf. We reject each of these arguments and affirm.

## BACKGROUND

### A. *The Reservation Disturbances*

Arthur Montour is a member of the Mohawk Indian tribe and a resident of the St. Regis/Awkwasasne Mohawk Indian Reservation ("St. Regis", "reservation"). Between late May and late July 1989 he was involved in a number of encounters between the New York State Police and the Warrior Society, a group of Mohawks living on St. Regis who believe in the sovereignty of the Mohawk Nation.

1. *The May Meeting.* During the latter part of May 1989, a number of confrontations between the police and the Warrior Society occurred, during which members of the Warrior Society protested State Police presence on St. Regis, whether for routine patrols or in response to particular complaints. Concerned about this situation, Major Ronald Brooks of the New York State Police contacted Eli Tarbell, the owner of a business establishment on St. Regis, to try to set up a meeting with members of the Warrior Society. Soon afterward, Major Brooks received a telephone call from Montour, and the two of them arranged to meet.

On May 27, 1989, Brooks, Montour, Captain Robert B. Leu of the New York State Police, and a number of persons from the Mohawk Nation met at a truck stop on St. Regis. A lengthy discussion ensued about the sovereignty of the Mohawks and the rights of the State Police to enforce laws on the reservation. Montour told Brooks that the police had no authority or jurisdiction on St. Regis, and that the Warrior Society viewed the police presence there as a violation of Mohawk sovereignty. An informal agreement was reached at this meeting: from then on, when a confrontation was at hand, the police would call Brooks and the residents of St. Regis would call Montour, in the hopes of their resolving the problem.

2. *The June 6, 1989 Roadblock.* In early June, some St. Regis residents telephoned the police and requested their assistance in ending reservation gambling. In response, the police obtained search warrants for several establishments, including Tony's Vegas International ("TVI") and the Bear's Den (adjoining reservation gambling establishments, located at the intersection of Route 37 and McGee Road). Two warrants were executed during the early evening hours of June 6.

As a result of this police activity, two marked State Police patrol cars were physically blocked later that evening at the Hogansburg Four Corners area of Route 37 by Montour and other residents of St. Regis. This prevented the cars from moving onto the reservation. Major Brooks was contacted regarding this situation, and his presence was requested by Montour.

Brooks responded to the scene, along with Leu and Captain Sitler of the New York State Police. Brooks discussed the situation with Montour, who stated that he viewed the police raids as an intrusion into Mohawk sovereignty. Montour did, however, offer to stop Warrior Society patrols on St. Regis for five days, in order to reduce tensions and allow everyone to cool down. At the conclusion of this conversation, Montour asked the Mohawks present to disband the roadblock and they did so.

Three more search warrants were executed the following day.

3. *The July 20, 1989 Roadblocks.* During the early morning hours of July 20, 1989, the Federal Bureau of Investigation ("FBI") and the New York State Police attempted to execute six federal search warrants, eleven federal arrest warrants, and one criminal summons on the St. Regis reservation. Approximately 150 New York State Police officers accompanied 50 FBI agents onto the reservation in that effort.

At about 5:00 a.m., New York State Police Captain Kenneth Cook, along with a group of FBI agents and State Police officers, approached TVI westbound along Route 37. They were stopped in front of TVI by a roadblock along Route 37 consisting of four to six vehicles, as well as twenty to twenty-five Native Americans armed with high-powered rifles. As Cook exited his vehicle, he observed an individual later identified as Montour leaving the vicinity of the roadblock and moving toward the parking lot of TVI. Cook saw Montour making gestures and yelling.

Along with another police officer, Cook approached the area of the roadblock. As he neared, a number of individuals moved to the front of the cars, yelling and screaming. Cook informed them that he was on the reservation to execute a federal search warrant. In response, he was told that the police would not be allowed onto the reservation, and that they would be harmed if they attempted to continue along Route 37.

At approximately the same time, FBI Special Agent Greene arrived at TVI. As he walked toward the barricade, one of the individuals guarding it stepped out from behind a parked car and told Greene not to proceed any further or someone would get hurt. Some time later, the State Police and the FBI who were at the TVI roadblock returned to their vehicles and drove off in search of an alternate route onto the reservation in order to execute the warrants.

A second roadblock was observed on St. Regis at about 5:00 a.m. on July 20. It consisted of a number of vehicles on Route 37 just west of the Bear's Den, as well as

several Mohawks armed with high-powered weapons.

At about 5:30 a.m., Sitler proceeded east along Route 37 in an unmarked car. As he approached the Bear's Den and TVI he observed a large number of vehicles in the parking lot of TVI as well as thirty to forty people. He also observed two cars across the roadway, blocking his progress. Realizing that he could go no further and was in a potentially volatile situation, he attempted to make a U-turn at the intersection of Route 37 and McGee Road. As he turned, approximately twelve to fifteen Mohawks attempted to block Route 37 and thereby prevent his westbound departure. As he accelerated past this group, several of the individuals made throwing motions, and a hard object struck and broke his windshield.

Also at about 5:30 a.m., Brooks received information at the command post about the roadblocks in front of the Bear's Den and TVI. He advised all of the police to hold their positions and attempted to contact Montour on a cellular phone Montour was known to carry. Brooks reached Montour and explained to him that the operation involved federal search warrants. Montour responded that, if the federal government was involved, such an action was a violation of all treaties and a declaration of war. Brooks briefly lost contact with Montour, reestablishing it at about 5:50 a.m. Brooks again expressed his concern about the roadblocks. Montour responded that the roadblocks would stay in place, and that they should negotiate the issue.

The search warrants and arrest warrants were subsequently executed at all locations except for TVI and the Bear's Den, where the roadblocks continued. At about 9:20 a.m., Brooks again contacted Montour, who informed Brooks that the roadblocks would remain because Montour expected further police raids on the reservation.

At about 10:00 a.m., New York State Police Undercover Investigator John Welch approached in an unmarked car a roadblock at the intersection of Routes 37 and 37C. He noted approximately ten to fifteen armed individuals and two cars blocking the roadway. He also observed Montour at the roadblock. After Montour gave his approval, the car immediately in front of Investigator Welch's was permitted through the roadblock, but Investigator Welch was not allowed through.

4. *The July 21, 1989 Telephone Conversation.* On July 21, 1989, Brooks had a final telephone conversation with Montour, who informed Brooks of a meeting Montour had attended with the Tribal Council (the three elected representatives of the reservation recognized by the state and federal governments). The Council had told Montour that they wished all roadblocks on St. Regis removed. However, Montour told Brooks that he would not remove his roadblocks. He further stated that, if the police removed the roadblocks on the edge of the reservation intended to prevent non-Indians and non-reservation residents from traveling into the area, Montour would then move Warrior Society roadblocks out to the edge of the reservation.

### B. *The Indictment and Trial*

Montour was indicted by a grand jury on three separate counts relating to the incidents described above. The first count alleged that from or about May 27, 1989 until August 1, 1989, Montour participated in a conspiracy to violate 18 U.S.C. § 2231 (1988)—a conspiracy to interfere forcibly with the execution of search warrants, in violation of 18 U.S.C. § 371 (1988). The indictment detailed nine overt acts Montour or his co-conspirators were alleged to have committed in furtherance of this conspiracy. The second count charged Montour with a violation of 18 U.S.C. § 2231(a) and (b)—the forcible interference with the execution of a search warrant, and the use of a deadly or dangerous weapon in the commission of that act. Finally, the third count charged Montour with a violation of 18 U.S.C. § 924(c)(1) (1988)—the use of a firearm during a crime of violence.

At the conclusion of a nine-day jury trial, Montour was found guilty of violating 18 U.S.C. §§ 371 and 2231(a), Counts 1 and 2(b) of the indictment. He was sentenced

to ten months imprisonment on each count, to be served concurrently. He now appeals from that conviction.

## DISCUSSION

Montour attacks his conviction on three separate grounds. He argues first that there was insufficient evidence to convict him of either a conspiracy to impede the execution of search warrants, 18 U.S.C. § 371, or of actually impeding the execution of search warrants, 18 U.S.C. § 2231(a). Next, he argues that the trial judge erred in failing to strike certain overt acts from the indictment. Finally, he argues that his Sixth Amendment right to present testimony on his behalf was denied by the trial judge's exclusion of the testimony of a proffered witness. There is no merit to any of these arguments.

### A. *Sufficiency of the Evidence*

■ 1. *Standard of Review.* Montour contends that the proper standard of review of sufficiency of the evidence in the instant matter is *strictissimi juris,* because of the political overtones of his arrest, trial, and conviction. Under *strictissimi juris,* a court must satisfy itself that there is sufficient direct or circumstantial evidence of the defendant's own advocacy of and participation in the illegal goals of the conspiracy and may not impute the illegal intent of alleged co-conspirators to the actions of the defendant. *See Noto v. United States,* 367 U.S. 290, 298–300, 81 S.Ct. 1517, 1521–1522, 6 L.Ed.2d 836 (1961); *Scales v. United States,* 367 U.S. 203, 232, 81 S.Ct. 1469, 1487, 6 L.Ed.2d 782 (1961); and *United States v. Spock,* 416 F.2d 165, 172–73 (1st Cir.1969).

■ Courts use *strictissimi juris* only under very special circumstances, however, and this appeal does not involve such a situation. *Strictissimi juris* applies only when "the group activity out of which the alleged offense develops can be described as a bifarious undertaking, involving both legal and illegal purposes and conduct, and is within the shadow of the first amendment." *United States v. Dellinger,* 472

F.2d 340, 392 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *see also Spock,* 416 F.2d at 173. When the ultimate objective of a group, of which the defendant is a member, is legal, but the means chosen to accomplish that end involve both legal and illegal activities, a court will apply *strictissimi juris* to ensure that the defendant was personally involved with the illegal aspects of the group activity.

■ So stated, it is clear that *strictissimi juris* does not apply to the instant matter. Here, both the alleged ends of the group (forcibly impeding the service of federal search warrants), and the alleged means chosen to achieve that end (setting up roadblocks on the reservation) were illegal. *See United States v. Cerilli,* 603 F.2d 415, 421–22 (3d Cir.1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980). *Cf. United States v. Casper,* 541 F.2d 1275 (8th Cir.1976) (normal standards of appellate review apply in appeal from convictions for attempting to interfere with United States Marshals and FBI agents during civil disorder at Wounded Knee, South Dakota), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977).

We thus apply the traditional standard that a conviction will be upset on sufficiency grounds only if no rational trier of fact, viewing the evidence in the light most favorable to the government, could find the defendant guilty beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). The evidence of guilt in the instant matter was ample both as to the conspiracy and the substantive crime.

2. *The Conspiracy.* Under 18 U.S.C. § 371, the government must prove: (i) an agreement between the defendant and others as to the object of the conspiracy; (ii) specific intent to achieve the objective of the conspiracy; and (iii) an overt act in furtherance of the conspiracy by the defendant or one of his co-conspirators.

a. *Agreement.* To prove the existence of an agreement, the government need not present evidence of a formal arrangement between the co-conspirators. *United States v. Wardy,* 777 F.2d 101, 107 (2d Cir.1985), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986). Rather, it is sufficient if the government can demonstrate that the defendant acted together with others to realize a common goal. *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974). In the instant matter, there was abundant evidence from which a rational trier of fact could conclude that Montour had agreed with others to impede the police in their efforts to execute search warrants. Montour's own conduct on July 20, 1989, which included participation with others in a roadblock, statements that the roadblocks maintained by others would remain in place, and acts causing others to prevent Investigator Welch from entering the reservation, was sufficient to prove the requisite agreement.

b. *Overt Acts 4, 5, and 8.* Montour also argues that there was insufficient evidence from which the jury could conclude that Overt Acts 4, 5, and 8, as described in the indictment, occurred.

Overt Act 4 alleged that:

On or about July 20, 1989, the defendant and his co-conspirators, some of whom were armed with rifles and other weapons, gathered at a business establishment on the St. Regis Reservation to prepare to establish a barricade.

There was sufficient evidence of this act. New York State Police Captain Kenneth Cook testified that he observed Montour at the TVI blockade on July 20. Moreover, Montour himself testified to being present in the Bear's Den parking lot at approximately 4:00 a.m. on July 20. This evidence, in conjunction with evidence about Montour's telephone conversations with Major Brooks on July 20, his actions on June 6, and his stated attitude towards police presence on the reservation, as expressed on numerous occasions during May, June and July of 1989, was surely sufficient to allow a rational juror to find that Overt Act 4

occurred as alleged. While some of the evidence connecting Montour to the roadblock is circumstantial, such evidence may establish the existence of, and Montour's participation in, a conspiracy. *See United States v. Sanzo,* 673 F.2d 64, 69 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982); *see also United States v. Martino,* 759 F.2d 998, 1002 (2d Cir. 1985).

Overt Act 5 alleged that:

On or about July 20, 1989 the defendant did supervise and direct the establishment of a barricade by his co-conspirators, some of whom were armed with guns, on Route 37, in the Town of Bombay, in the County of Franklin, in order to interfere with the execution of search warrants.

Montour argues that in order to establish this overt act, the government must prove that an actual attempt to execute search warrants was foiled by the roadblock described in the act. In particular, he stresses that the only evidence concerning this roadblock was testimony of Investigator Welch, who had no search warrant with him when his way was blocked. Thus, Montour concludes, the government has not offered any evidence that this roadblock interfered with the execution of a search warrant.

While Montour's characterization of the evidence is correct, Welch's non-possession of a warrant when he was stopped at the roadblock is irrelevant to the charge that the roadblock in question was established by the conspirators for the purpose of impeding execution of the search warrants. The jury was entitled to view the evidence as a whole, rather than view each item of evidence in isolation, *see United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and to conclude from the evidence that the roadblock described in overt act 5 was established by Montour and his co-conspirators to interfere with the execution of search warrants.

Overt Act 8 alleged that:

On or about July 20, 1989 the defendant did state to Major Brooks of the

New York State Police that the execution of federal search warrants by members of the federal bureau of investigation was considered by the defendant to constitute a declaration of war and that he was going to maintain the barricades that he had caused to be established. Montour argues that the government presented no evidence of a statement by him that he had established roadblocks. As a result, he asserts that a conviction based on Overt Act 8 cannot be upheld. Once again, however, the government may rely upon circumstantial evidence to prove overt acts. *See Martino,* 759 F.2d at 1002; *Sanzo,* 673 F.2d at 69. While there was perhaps no direct testimony that Montour caused the roadblocks to be established, there was sufficient evidence from which the jury could infer that he had done so. Brooks testified as to a number of different conversations with Montour on the morning of July 20, in which Montour asserted his power to maintain the roadblocks. A rational juror could readily conclude from those conversations, as well as from other evidence showing Montour's leadership role regarding the roadblocks, that Montour had caused their establishment.

■ 3. *The Substantive Crime.* Montour also attacks the sufficiency of the government's evidence proving the commission of Count 2(b) of the indictment—that Montour, "aided and abetted by others unknown to the grand jury, did forcibly resist, impede, and interfere with persons authorized to execute search warrants ... [i]n violation of Title 18 U.S.C. § 2231(a)...." The gravamen of Montour's argument is that while roadblocks were established, their purpose was simply to block police access per se, and not specifically to impede the execution of search warrants. He thus concludes that he did not have the specific intent necessary for the commission of this crime. However, the evidence detailed above would allow a rational trier of fact to conclude that Montour specifically intended to interfere with the execution of search warrants by means of the roadblocks.

B. *Failure to Strike Certain Overt Acts*

■ Montour next contends that Overt Acts 1, 2, 3, 6, 7, and 9 ought to have been struck from the indictment. A trial judge may strike irrelevant portions of an indictment, including overt acts from a conspiracy count. *See United States v. Miller,* 471 U.S. 130, 144–45, 105 S.Ct. 1811, 1819–20, 85 L.Ed.2d 99 (1985); *United States v. Wilner,* 523 F.2d 68, 72 (2d Cir. 1975); *see also* Fed.R.Crim.P. 7(d) ("The court on motion of the defendant may strike surplusage from the indictment or information."). However, as long as the overt acts alleged are relevant to the conspiracy charge, the trial judge's refusal to strike is not error. *United States v. Langella,* 776 F.2d 1078, 1081 (2d Cir.1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986); *see also United States v. Klein,* 124 F.Supp. 476, 479–80 (S.D.N.Y.1954).

1. *Overt Act 1.* Overt Act 1 alleged that:

> On or about May 27, 1989 the defendant attended a meeting with officials of the New York State Police as leader and spokesperson of the "Warrior Society", and stated that the New York State Police did not have any jurisdiction on the St. Regis/Awkwasasne Mohawk Indian Reservation.

Montour argues that the district court should have struck this overt act because it described a legal activity unconnected to the alleged conspiracy to impede the execution of warrants over one month later.

■ Montour correctly characterizes the conduct described by Overt Act 1, when viewed in isolation, as legitimate. However, an overt act need not be inherently criminal to support a conspiracy conviction. *United States v. Slocum,* 695 F.2d 650, 654 (2d Cir.1982), *cert. denied,* 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983). If an act is relevant to the alleged conspiracy when viewed in light of all the evidence, it should not be stricken. *See United States v. Diaz,* 878 F.2d 608, 614–15 (2d Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989) (subsequent events may

show relevance of prior conduct to conspiracy). Only when viewed in isolation is the May meeting unrelated to the alleged conspiracy. Viewed against the events of June and July, testimony concerning the May 27 meeting revealed Montour's opinions about the authority of State Police on the reservation, his views about the sovereignty of the Mohawk Nation, and his leadership role in the Warrior Society. All of this was relevant to Montour's participation in the conspiracy to prevent the execution of search warrants on the reservation. It was therefore not error to decline to strike Overt Act 1 from the indictment. *Cf. United States v. Angelilli,* 660 F.2d 23, 39 (2d Cir.1981) ("Even acts prior to the first act alleged in the indictment may be proven to show the continuing nature of the conspiracy."), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982).

■ 2. *Overt Acts 2 and 3.* Overt Act 2 alleged that:

On or about June 7, 1989, after search warrants were executed by the New York State Police at the St. Regis Reservation, the defendant did establish and aid and abet the establishment of a barricade blocking Route 37 in the Town of Bombay in Franklin County.

Montour contends that this act should have been stricken. He describes his conduct as alleged in the overt act as "spontaneous" and intended only to forestall a major incident between the police and the residents of St. Regis. While the jury may have been free to characterize these events in that way, it could also readily conclude that Montour's acts showed the existence of a conspiracy among Montour and others to interfere with the police. It was thus not error for the trial court to refuse to strike Overt Act 2 from the indictment.

Overt Act 3 alleged that:

On or about June 7, 1989, the defendant attended a meeting as a spokesperson of the group of persons barricading Route 37 in the town of Bombay in Franklin County and stated that he would remove his group members from the reservation.

Once again, Montour paints these events in the most positive light, arguing that his conduct illustrated his willingness to negotiate with the police to reach a peaceful resolution of the dispute. Again, however, the jury could find that this conduct was probative of the conspiracy and Montour's role in it.

■ 3. *Overt Acts 6 and 7.* Overt Act 6 alleged that:

On or about July 20, 1989 an unidentified co-conspirator of the defendant did state to an FBI agent approaching the barricade "Don't come any further or someone's going to get hurt".

Overt Act 7 alleged that:

On or about July 20, 1989 an unidentified co-conspirator of the defendant did throw an object at a New York State police car causing a broken windshield.

Montour never moved in the district court to strike these overt acts from the indictment. Nor did he object to the evidence offered by the government to prove them. Their submission to the jury is, therefore, reversible only if plain error. Fed.R.Crim.P. 52(b). Montour relies only upon the doctrine of *strictissimi juris* to demonstrate the impropriety of admitting these statements and acts of his co-conspirators. As discussed *supra,* however, *strictissimi juris* is not the proper standard of review. Declarations of Montour's co-conspirators in furtherance of the conspiracy were thus clearly admissible against Montour under Fed.R.Evid. 801(d)(2)(E). *See United States v. Gleason,* 616 F.2d 2, 16 (2d Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); *United States v. Araujo,* 539 F.2d 287, 289 (2d Cir.), *cert. denied,* 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976).

■ 4. *Overt Act 9.* Overt Act 9 alleged that:

On or about July 21, 1989 the defendant did attend a meeting of the tribal chiefs duly elected by the Mohawk Nation and, upon being directed to dissolve all barricades and vacate the area, refused to do so and continued to maintain

the barricades that he had caused to be established.

Montour argues that this overt act should have been stricken because the acts alleged occurred after the police terminated their efforts to execute the remaining warrants on the reservation. However, a conspiracy continues until some affirmative act of the conspirators terminates it. *United States v. Rucker,* 586 F.2d 899, 906 (2d Cir.1978). Although no actual attempts were made to execute warrants after July 20, the road-blocks stayed in place, and forcible resistance to police entry continued for as long as those roadblocks remained. The conspiracy to prevent execution of the search warrants thus had not ended on July 21. Moreover, the overt act is relevant to the conspiracy charge because it demonstrates the control Montour had over the existence of the roadblocks. Additionally, evidence of this conversation would have been admissible regardless of whether the overt act itself was stricken from the indictment, Fed.R.Evid. 801(d)(2)(A), and the failure to strike would have been harmless.

C. *Sixth Amendment Right to Present Witnesses*

■ Montour contends, finally, that his Sixth Amendment rights were denied by the trial judge's refusal to permit a witness, Mrs. Rowena General, to testify. Her testimony was proffered to Judge McCurn outside the presence of the jury. That testimony largely concerned the alleged harassment of reservation residents by the New York State Police during June and July of 1989. Mrs. General, however, did not personally observe any of this harassment, and these alleged incidents were not related to the charges against Montour. The district court therefore ruled her testimony irrelevant. Montour's attempt to relate this testimony to his supposed lack of specific intent mistakenly assumes that a good motive is evidence of lack of specific intent. It was thus well within the judge's discretion to exclude Mrs. General's testimony. Fed.R.Evid. 402.

The Sixth Amendment does not provide a constitutional guarantee for the admission of irrelevant testimony and thus offers Montour no support.

Affirmed.