**UNITED STATES of America,
Appellee,**

v.

**Milvio DUARTE, Defendant–Appellant.**

**No. 00–1656.**

United States Court of Appeals,
Second Circuit.

July 2, 2001.

48

Richard Ware Levitt, N.Y., NY, for appellant.

I. Bennett Capers, Ass't U.S. Att'y, SDNY, N.Y., NY, for appellee.

Present VAN GRAAFEILAND, and KEARSE, Circuit Judges, and RAKOFF,* District Judge.

## SUMMARY ORDER

This cause came on to be heard on the record from the United States District Court for the Southern District of New York, and was argued by counsel.

ON CONSIDERATION WHEREOF, it is now hereby ordered, adjudged, and decreed that the judgment of said District Court be and it hereby is affirmed.

Defendant Milvio Duarte appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before Charles S. Haight, Jr., *Judge*, convicting him of murder of an informant to prevent testimony, in violation of 18 U.S.C. §§ 1512(a)(1) and 2; murder in aid of racketeering, and conspiracy to commit such a murder, in violation of 18 U.S.C. §§ 1959(a)(1) and (5); and using and carrying a firearm in relation to a murder, in violation of 18 U.S.C. § 924(c). He was sentenced principally to life imprisonment on the murder-related counts and a five-year consecutive term of imprisonment on the firearm charge, to be followed by five years of supervised release. On appeal, Duarte contends that he is entitled to a new trial because of improper questioning and summation by the government and because of errors in the trial court's admission of evidence and instructions to the jury. Although the trial was not error-free, we conclude that such errors as occurred, some of which were not objected to at trial, did not deprive Duarte of a fair trial.

* Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

Duarte complains principally of the trial court's admission of several types of evidence against him: testimony by a former Assistant United States Attorney ("AUSA") who prosecuted him in connection with narcotics charges following his arrest in August 1993; cross-examination of Duarte with respect to the drug trafficking and arrests of other persons while Duarte was incarcerated after mid–1994 for his narcotics conviction; cross-examination of Duarte as to the veracity of another witness; and introduction of a business card found at the scene of the murder of Nelson Almonte, who was to have been the key witness in the anticipated trial of Duarte on the drug-trafficking charges. Certain of these complaints are troublesome.

■ With respect to Duarte's trial contention that he had had no motive to murder Almonte, the government called as a witness David Wales, the AUSA who had prosecuted Duarte on the 1993 narcotics charges, to testify that in that case something "unusual" had occurred at a pretrial hearing, to wit, that Duarte's attorney had repeatedly informed the court that the informant against Duarte was Almonte. Duarte contends that it was error for the court to allow Wales to testify to "—and elaborate on—his personal belief that the use of the informant's name in open court, prior to the time the government had disclosed the informant's identity, was unprecedented, 'unusual,' and somehow sinister." (Duarte brief on appeal at 23.) We agree that Wales's personal beliefs and opinion of general practices with respect to nondisclosure of the identities of confidential informants were inadmissible and irrelevant. And to the extent that the government meant to suggest that because a defendant usually does not know the informant's identity, the informant usually is not killed before he can testify, and that because Duarte knew Almonte's identity he must have been the person who caused

Almonte's murder, that argument was tenuous. But we cannot conclude that the admission of this testimony provides a ground for reversal.

■ The erroneous admission of evidence is harmless where we can conclude with fair assurance that the evidence did not substantially influence the jury and that it is highly probable that the error did not contribute to the verdict. *See, e.g., United States v. Dhinsa,* 243 F.3d 635, 649 (2d Cir.2001); *United States v. Colombo,* 909 F.2d 711, 713 (2d Cir.1990); *see also* Fed.R.Crim.P. 52(a); *United States v. Rea,* 958 F.2d 1206, 1220 (2d Cir.1992). We reach those conclusions here because, as discussed below, there was strong direct evidence against Duarte, to wit, the testimony of Miguel Feliz, who testified that Duarte had hired him and his associates to kill Almonte.

The government's evidence included the testimony of Luis Pizarro, a special agent of the United States Drug Enforcement Administration ("DEA"), that Duarte was arrested in August 1993 on narcotics-trafficking charges based on information provided by Almonte. Almonte had had a number of conversations, some of which were recorded, with Duarte and Duarte's brother Junior Duarte ("Junior"), in which the Duarte brothers negotiated to sell Almonte 10 kilograms of cocaine. Pizarro testified that on August 4, 1993, Almonte met with the Duarte brothers and some of their associates for the scheduled consummation of the first installment of the sale; that after Almonte gave a predetermined signal, DEA agents arrested Duarte, Junior, and their associates; and that the agents did not stage an arrest of Almonte, who, while the arrestees were being handcuffed, approached an agent and handed him the keys to the car that contained four kilograms of cocaine.

Another DEA agent testified that Junior, when arrested, had in his pocket a

scrap of paper bearing the name "Pingita" and a telephone number. Feliz testified that "Pingita" ( [sic ] see, e.g., Trial Transcript ("Tr.") at 184; see also, e.g., Tr. 430 ("Pinguita")) was a nickname by which Duarte and others referred to one Jose Erbo; that Erbo was the leader of a group of narcotics-dealing customers of Duarte; that Feliz was Pingita's second-in-command; and that the Erbo crew supplemented its drug income by committing murder for hire. Former AUSA Wales testified that in the drug prosecution of Duarte, the district judge indicated that she would set a trial date at a pretrial conference scheduled for March 4, 1994; that on March 4 the judge did not set a trial date, but indicated that she would do so at the next conference, scheduled for April 29; and that on April 22, Almonte was killed.

Feliz testified that Erbo and crew member "Mike" Mungin killed Almonte. Feliz stated that more than a month prior to April 22, Duarte had offered the Erbo crew 1½ kilograms of cocaine to kill the person who was to testify against Duarte at his drug trial, and that Duarte made several unsuccessful attempts in the interim to lure Almonte to an area in which he could be killed. On April 22, Erbo and Feliz responded to paging from Duarte and parked across the street from the store at which Duarte worked; Erbo went into the store and returned with Duarte, who then led them to Almonte a few blocks away; Duarte pointed out Almonte as the man he wanted killed, but he instructed Feliz and Erbo not to kill Almonte in that neighborhood. Feliz testified that Erbo then paged Mungin and told him to bring a motorcycle and guns; that when Almonte and his companions later entered a car and drove away, Erbo and Mungin followed on the motorcycle; and that when Almonte eventually stopped for a traffic light, Erbo and Mungin drew alongside his car and

shot Almonte, killing him and wounding several passengers in the process. The sequence of events described by Feliz after Duarte led Erbo and Feliz to Almonte was corroborated in part by the testimony of an Almonte companion who was one of the injured passengers. The existence of a link between the Duarte brothers and the Erbo crew was corroborated by Junior's possession, when arrested in 1993, of a piece of paper with a telephone number and Erbo's nickname on it. And Feliz's testimony that, just prior to the tracking and killing of Almonte, Feliz and Erbo had picked up Duarte at the store where Duarte worked was somewhat supported by the fact that, though the shooting of Almonte took place some 50 blocks away, a business card for a travel agency located across the street from that store, i.e ., located where Feliz and Erbo had parked to pick up Duarte, was found near the shell casings at the site of the Almonte shooting.

Given this record, the testimony as to former AUSA Wales's view that, inter alia, it was "unusual" for a defendant to know the identity of an informant seems entirely unlikely to have contributed to the verdict. First, given DEA agent Pizarro's testimony describing the arrest of Duarte, the jury could well have inferred that Duarte's knowledge that Almonte was the informant had no sinister provenance because Almonte's identity had been compromised at Duarte's arrest, both by the failure of DEA agents to protect Almonte by staging his arrest along with the arrests of the Duarte brothers and their associates, and by Almonte's own actions in approaching a DEA agent and handing him the keys to the car that held the cocaine while Duarte et al. were being handcuffed. Second, with respect to Duarte's contention that he had no motive to kill Almonte, the relevant fact was that Duarte knew that Almonte was the person who was to be the key witness against him. The possibility that the manner in which he gained that

information was "unusual" is of little pertinence alongside (a) the publicly revealed fact that he had that knowledge and (b) the permissible inference that the knowledge itself, whatever its source, showed his motive for murdering Almonte. Finally, the direct evidence from Feliz that Duarte in fact hired Feliz and his associates to kill Almonte was strong, and Feliz's testimony was circumstantially supported by other testimony and physical evidence. We conclude that the admission of the irrelevant Wales testimony was harmless.

■ Duarte also complains that introduction of the business card from the travel agency across the street from where he worked was error because it was irrelevant. We disagree. The trial judge has broad discretion in ruling on the admissibility of evidence, and we will not overturn such rulings absent an abuse of discretion. *See, e.g., United States v. Wong,* 40 F.3d 1347, 1378 (2d Cir.1994), *cert. denied,* 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995); *see also United States v. Diaz,* 878 F.2d 608, 614 (2d Cir.1989) ("determinations of relevance are entrusted to the sound discretion of the trial judge, and his decision will not be overturned unless he has acted arbitrarily or irrationally" (internal quotation marks omitted)). Although we doubt that the business card had as much probative value as the government attributes to it, it provided some corroboration for Feliz's testimony that he and Erbo had been at the location shown on that card—*i.e.,* across the street from where Duarte worked—just prior to Almonte's murder, and it was well within the trial court's discretion to conclude that the card should be admitted. Any challenges to the weight to be given to the card were arguments to be made to the jury.

■ We find greater merit in Duarte's contention that the district court erred in allowing the government to cross-examine him as to whether members of his extended family allegedly engaged in narcotics-trafficking while Duarte was in jail following his narcotics conviction, as purportedly evidenced by his brother-in-law's arrest in 1998. Although the district court reasoned that Duarte had opened the door to such questioning by denying that he engaged in any further narcotics dealing after his August 1993 arrest, we do not share the district court's view that allegations of drug trafficking by members of Duarte's family while Duarte was in jail in 1993 and from 1994 through his brother-in-law's arrest in 1998 or 1999 were probative of Duarte's own drug trafficking during Duarte's bail period from September 1993 to July 1994. Nonetheless, as the district court noted in denying Duarte's motion for a new trial, "it was clear from both the questions and answers that [Duarte] was in jail at the time of his brother-in-law's arrest and ... that [Duarte] had already admitted to his own involvement in drug trafficking, albeit during an earlier time period," Memorandum Opinion and Order dated February 14, 2000, at 3, and we agree with the district court's view that in these circumstances the evidence of his in-laws' actions was unlikely to have caused Duarte substantial prejudice, *see id.* We conclude that, in light of those facts and the strength of the government's evidence of Duarte's instigation of the murder of Almonte, the error in admitting evidence of drug trafficking by others was harmless.

■ Duarte also complains of certain other aspects of the government's cross-examination of him at trial, in particular (a) asking Duarte to admit that the district judge who presided over his narcotics case had found his testimony in connection with a motion under 28 U.S.C. § 2255 in that case to be less than credible, and (b) questioning him as to whether his former attorney, testifying at the present trial, was lying. These questions were entirely improper, as determinations of credibility are for the jury. *See, e.g., Sartor v. Arkansas*

*Natural Gas Corp.*, 321 U.S. 620, 628, 64 S.Ct. 724, 88 L.Ed. 967 (1944). Thus, it is inappropriate for the jury to be informed of a judicial assessment of other testimony in another case. *See generally United States v. McCormack*, 829 F.2d 322, 326 (2d Cir.1987) (Kearse, J., concurring, joined by Mahoney, J.) ("[I]nforming the jury that a court has found similar evidence sufficient invites the jury, which will ordinarily be respectful of and deferential to the views of a court, to convict because that learned entity has done so. The jury should not be urged to do other than to decide its own view of the facts on the basis of the evidence before it...."). We have also repeatedly held that it is improper to ask one witness to express an opinion as to the credibility of another witness. *See, e.g., United States v. Forrester*, 60 F.3d 52, 63 (2d Cir.1995); *United States v. Richter*, 826 F.2d 206, 208 (2d Cir.1987); *United States v. Scanio*, 900 F.2d 485, 493 (2d Cir.1990), *reversed on other grounds sub nom., Ratzlaf v. United States*, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *see generally United States v. Weiss*, 930 F.2d 185, 195 (2d Cir.), *cert. denied*, 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991). Nonetheless, for various reasons, these two improper lines of questioning provide no basis for reversal here.

■ The first line of questioning was excluded by the court. When the AUSA informed the court that he wished to bring out that the judge who ruled on Duarte's § 2255 motion in the narcotics prosecution had found Duarte to be an incredible witness, the court sustained the defense objection, stating, "it's for this jury to decide who is credible and w[h]o is incredible. I am not going to let you put in a comment from a judge in a collateral hearing what the judge thought. I think it's not fair." (Tr. 876.) Despite that clear ruling, the prosecutor sought to achieve his goal by asking Duarte whether the § 2255 court

had ruled against him "after hearing [Duarte's] testimony and then [his attorney's] testimony." (Tr. 878.) This only slightly more subtle question—designed to elicit the precise fact that the trial court had excluded—was improper; but the question was objected to, and the objection was promptly sustained. We see no likelihood that the question itself substantially influenced the jury or contributed to the verdict. Although the trial judge did not give an immediate curative instruction, defense counsel did not ask for one; and we see no error in the court's not *sua sponte* giving such an instruction, which might have disserved Duarte's interests by making the fact of the prior judge's credibility assessment more obvious. And although the prosecutor verged on making a similarly improper argument on summation (*see* Tr. 1049), the trial court, in its instructions at the close of trial, properly informed the jury that all credibility questions were solely for the jury to decide. We conclude that this inappropriate questioning and argument by the prosecutor was undoubtedly harmless.

■ As to the government's asking Duarte whether his attorney was lying, that line of questioning was not objected to at trial, and hence is reviewable only for plain error, *see, e.g.*, Fed.R.Crim.P. 52. Plain error is an error that prejudicially affected the defendant's "substantial rights" and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks omitted). We see no such error here. Duarte himself on direct examination had testified that there was a conflict between his and his attorney's versions of the pertinent conversations. And the trial court instructed the jury that all conflicts in the evidence, as well as all credibility assessments, were to be resolved solely by the jury. In these circumstances, and giv-

en the strength of the government's case, described above, we conclude that the cross-examination of Duarte as to whether his attorney was lying did not seriously affect the fairness of the proceedings.

■ Duarte also contends that the government's summation unfairly deprived him of the presumption of innocence. That summation included the statements that "[w]hen this trial started two weeks ago, the defendant was cloaked in the presumption of innocence, but that was two weeks ago. That was before you heard the testimony in this case, and before you heard the evidence in this case. And the government submits that, after that evidence, after that testimony, that cloak of innocence is long gone." (Tr. 1118.) Duarte did not object to this statement at trial, and thus it too is reviewable only for plain error. It does not meet that standard. After the summations, the district court gave the jury a lengthy instruction as to the presumption of innocence, stating, *inter alia,* that "[t]he presumption of innocence is not a mere formality" but is "vitally important, and each juror is bound to honor it conscientiously, sincerely, and ungrudgingly, without any mental reservation whatsoever, and to give to the defendant the full benefit of the presumption of innocence" (Tr. 1150); that "the presumption of innocence alone is sufficient to acquit the defendant" (Tr. 1151); and that "*[t]he presumption of innocence was in the defendant's favor at the start of this trial. It continued in his favor throughout the entire trial. It is in his favor even as I instruct you now. It remains in his favor during the course of your deliberations in the jury room.* It is removed only if and when you are satisfied that the government has sustained its burden of proving the guilt of the defendant upon a particular charge beyond a reasonable doubt" (*id.* (emphasis added)). In light of the court's instructions, we cannot conclude that the prosecutor's unobjected-to statements substantially affected the fairness of the trial. It is also worthy of note that, along with the counts on which he was convicted, Duarte was charged with murdering Almonte as retaliation, in violation of 18 U.S.C. § 1513(a)(1) and 18 U.S.C. § 2; the jury acquitted him of that charge.

■ Finally, Duarte complains that, in instructing the jury, the district court not only listed the elements of the § 1512 witness-tampering offense but also explained to the jury the purpose of § 1512, stating that the "statute is designed to protect persons who are victims of federal crimes, persons who may be called to testify or give evidence in a federal proceeding, and persons who have information about federal crimes," that "[t]he integrity of the federal system of justice depends upon the cooperation of such victims and potential witnesses," and that the section is "designed to make it unlawful for anyone to tamper with such a witness in the manner described by the statute" (Tr. 1179–80). Duarte argues that this "instruction strongly suggested . . . that *Feliz* was . . . a witness whose testimony added to the 'integrity of the federal system of justice.'" (Duarte brief on appeal at 49 (emphasis added).) This instruction provides no basis for reversal. Giving "[a] charge on statutory purpose is not an abuse of discretion," *United States v. Perez,* 702 F.2d 33, 37–38 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983), and there was no inaccuracy in the court's description of the statutory purpose of § 1512. Further, Duarte's interpretation of the explanation is untenable, for it is unmistakably clear that the court was placing in context the need to protect witnesses such as Almonte and to deter conduct that would prevent such witnesses from testifying. We see no likelihood that the jury would have inferred instead that the court meant that the testimony of Feliz was to be believed.

We have considered all of Duarte's contentions on this appeal and have found in them, whether viewed singly or in combination, no basis for reversal. A defendant has a right to a fair trial, not necessarily to a perfect one. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The nature and context of the errors that occurred here, the strength of the government's properly admitted evidence, and the fact that the jury acquitted Duarte on one of the counts with which he was charged persuade us that the trial of Duarte, though not perfect, was fair.

The judgment of conviction is affirmed.